[No. C050709. Third Dist. June 22, 2006.]

TEICHERT CONSTRUCTION, Plaintiff and Appellant, v.
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS
BOARD, Defendant and Respondent;
DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF
OCCUPATIONAL SAFETY AND HEALTH, Real Party in Interest and
Respondent.

## COUNSEL

Robert D. Peterson for Plaintiff and Appellant.

Douglas G. Nareau and James A. Madden for Defendant and Respondent.

Michael D. Mason and Mary A. Allen for Real Party in Interest and Respondent.

## OPINION

**SCOTLAND, P. J.**—Teichert Construction (Teichert) sought to overturn a decision of the California Occupational Safety and Health Appeals Board (the Board) which upheld a citation issued by the California Department of Industrial Relations, Division of Occupational Safety and Health (the Division) for violation of a safety order, and assessed Teichert a civil penalty of $5,000. In Teichert's view, the safety order is unconstitutionally vague, and the Board failed to determine whether Teichert's conduct was reasonable. Teichert appeals from the superior court's denial of its petition for a writ of administrative mandate. We shall affirm the judgment.

As we will explain, the requirement that hauling and earth moving operations "be controlled in such a manner as to ensure that equipment or vehicle operators know of the presence of . . . workers on foot in the areas of their operations" is not impermissibly vague. A reasonable and practical construction of the regulation puts businesses, like Teichert, on notice that (1) they must control hauling and earth moving operations in a manner to ensure equipment operators know of a worker's location on foot *within the immediate vicinity of the operators*, and (2) simply informing equipment operators that workers will be on foot in the general area of such operations does not satisfy the requirement. Sufficient evidence supports the Board's finding that Teichert "could have known with the exercise of reasonable diligence" of the condition which violated the regulation.

## FACTS

On June 3, 1998, Teichert employee Robert McCorkle was involved in a terrible accident while on the job. He was hit by a scraper, a 98,000-pound piece of earth moving equipment. Fortunately, McCorkle was somehow thrown out from under the scraper and survived. However, he suffered serious bodily injuries.

After an investigation, the Division cited Teichert for a serious violation of General Industry Safety Order 1592, subdivision (e) (Cal. Code Regs., tit. 8, § 1592, subd. (e)), a regulation that requires hauling or earth moving operations to "be controlled" so that operators know of the presence of workers on foot in the areas of operation. Teichert filed an appeal from the citation, and an evidentiary hearing was held before an administrative law judge (ALJ). The ALJ issued a decision upholding the citation.

Teichert sought and obtained reconsideration by the Board, which issued a decision upholding the citation. By petition for a writ of administrative mandate, filed in the superior court, Teichert unsuccessfully challenged the Board's decision.

██ California Code of Regulations, title 8, section 1592, subdivision (e) states: "Hauling or earth moving operations shall be controlled in such a manner as to ensure that equipment or vehicle operators know of the presence of rootpickers, spotters, lab technicians, surveyors, or other workers on foot in the areas of their operations." At the time of McCorkle's accident, the law provided that a serious violation "shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a serious exposure exceeding an established permissible exposure limit or a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in the place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." (Lab. Code, former § 6432, subd. (a); Stats. 1990, ch. 1384, § 2, p. 6338.)[1]

In reviewing the Board's factual determinations, both the trial court and this court apply the familiar substantial evidence rule. (Lab. Code, § 6629; *Rick's Electric, Inc. v. Occupational Safety & Health Appeals Bd.* (2000) 80

---

[1] Labor Code section 6432 was amended in 1999, after the accident in this case. (Stats. 1999, ch. 615, § 10.) The primary change in the law is that it now places the burden on the employer to demonstrate that it did not, and could not with the exercise of reasonable diligence, know of the presence of the violation. In resolving this case, the Board applied the version of the law in effect at the time of McCorkle's accident.

Cal.App.4th 1023, 1033 [95 Cal.Rptr.2d 847].) We view the evidence in a light most favorable to the Board's decision, drawing all reasonable inferences and resolving all conflicts in the evidence in favor of the decision. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Viewed in this light, the evidence before the Board reflects the following facts:

At the time of the accident, Teichert was in the process of preparing a parcel of property for the construction of multi-unit dwellings. The job consisted of moving earth from one side of the parcel, referred to as the cut area, to the other side, referred to as the fill area, where it would be deposited for the construction of pads. The job required dozers, scrapers, a compactor, and a blade.

The first step in the process required an operator to run a dozer in the cut area to loosen the earth, referred to as ripping. The scrapers would move into position to load the loose dirt. The scrapers being used on the job were not self-loading, i.e., they were push scrapers. This meant that when the scraper was in place, it would be pushed forward through the cut area by a dozer. Once loaded, the scraper would be driven along a haul road to the fill area. After depositing the load, the scraper operator would return to the cut area.

When sufficient dirt had been moved onto a pad, the pad would be finished by the use of a compactor and then a blade. The scrapers would be directed to a new pad to begin placing fill. The haul road was constantly adjusted to reflect the new area of fill. Witnesses established that once a pad was filled, scrapers should not be driven across it.

During the work, there were two, and sometimes as many as four, workers on foot at the jobsite. One worker was stationed at the cut area to direct the scrapers where to obtain their loads. One worker, in this case McCorkle, was stationed at the fill area. Among other things, McCorkle's job was to direct the scrapers where to deposit their loads. The grading foreman, Stephen Thomas, went back and forth between the cut area and the fill area, and was sometimes on foot.

One of the operators on this job was Kathy Hoyt. She was an apprentice. Thomas testified that there are four levels for apprentices, with advancement to a new level after every 1,000 hours of operation. He believed that Hoyt had about 3,000 hours of operation. On the first day of the project, Thomas assigned Hoyt to do the ripping at the cut area. He did not know Hoyt but assigned her to the ripping job because she had worked for "underground," where scrapers are not used.

On the day before the accident, a change in assignment was made. There was evidence that operators are paid, at least in part, based upon the amount

of dirt they move. The operator who had been running the push dozer, Mike Mills, was described as a "real high dollar" operator. Complaining that the scraper drivers were poor operators who did not keep up, he threatened to walk off the job. At Thomas's request, Mills agreed to finish the day as the ripper operator. Thomas asked Hoyt whether she could operate a scraper. Saying she thought that she could, Hoyt added either that she was not very good at it or that she had not done it in a while. Thomas moved a scraper operator to the push dozer and assigned Hoyt to a scraper. He watched Hoyt for a couple of loads and concluded that she could operate the scraper.

On the day of the accident, Hoyt operated a scraper. Near the end of the workday, two pads situated east and west of each other had received sufficient fill, and the fill area had been moved to the north. Hoyt was driving her scraper from the cut area to the fill area when her scraper struck and knocked down a stake. At this point in time, there was some confusion at the worksite.

McCorkle was on the west pad that had received sufficient fill, and the east pad was undergoing compaction. McCorkle saw Hoyt's scraper leave the haul road and come onto the west pad in his direction. Hoyt testified she saw McCorkle on the west pad and believed that he was signaling her to dump the load on the west pad. Hoyt stopped her scraper next to McCorkle and told him of the broken stake. McCorkle said he would fix it. He then told Hoyt to dump the load in the fill area and to return to the cut area.

Hoyt believed that McCorkle had directed her to dump the load on the west pad, rather than on the pad to the north. This was not the right place to dump the dirt. After dumping the load on the west pad, Hoyt drove onto the east pad and turned right to go back to the cut area.

Because there is a huge blind spot to the right of a scraper, a scraper operator can see virtually nothing to the right side unless the operator stops and articulates the cab, which pivots independently of the scraper, or gets out and looks to the right. As Hoyt made a right turn in the scraper, McCorkle was traversing the east pad on foot toward the broken stake. Hoyt did not see McCorkle. She got a "really bad gut feeling" and stopped the scraper, but not before McCorkle was hit and injured.

DISCUSSION

I

Teichert contends that California Code of Regulations, title 8, section 1592, subdivision (e) is unenforceably vague and ambiguous. Although we already have quoted the regulation above, we do so again for convenience of reading.

"Hauling or earth moving operations shall be controlled in such a manner as to ensure that equipment or vehicle operators know of the presence of rootpickers, spotters, lab technicians, surveyors, or other workers on foot in the areas of their operations." (*Ibid.*)

## A

During the administrative proceedings, Teichert and the Division's witness proposed different interpretations of the rule, and the ALJ and Board adopted another interpretation. In Teichert's view, this disagreement means that the rule is unenforceable for lack of clarity.

In the hearing before the ALJ, Teichert took the position that its duty under the rule was satisfied as long as operators had general knowledge that there would be an employee in the cut area and another in the fill area. The Division's witness took the position that operators must know the positions of workers on foot at all times. The ALJ considered these positions to be extreme, noting that in the circumstances of the case, it would be impossible for an operator to know the exact position of everyone on foot at every moment. The ALJ concluded, however, that it is not sufficient for operators to know there would be workers on foot in the general area. Rather, the rule requires operators to be aware when there are workers on foot in the immediate vicinity of the operators.

The Board agreed with the ALJ and concluded that the rule requires an employer to control earth moving operations in such a manner to ensure that an equipment operator knows of a worker's location on foot within the immediate vicinity of the operator.

## B

A statute violates due process of law if it forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].) While vagueness challenges arise most commonly in the criminal context, the prohibition against vagueness extends to administrative regulations as well. (*Id.* at pp. 763–764.) However, when an administrative regulation is challenged, the standard of constitutional vagueness is less strict than when a criminal law is challenged. (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 366 [185 Cal.Rptr. 453, 650 P.2d 328].)

In considering a vagueness challenge to an administrative regulation, we do not view the regulation in the abstract; rather, we consider whether it is

vague when applied to the complaining party's conduct in light of the specific facts of the particular case. (*Cranston v. City of Richmond, supra,* 40 Cal.3d at p. 765.) If it can be given a reasonable and practical construction that is consistent with probable legislative intent and encompasses the conduct of the complaining party, the regulation must be upheld. (*Ibid.*)

A regulation is not unconstitutionally vague simply because alternative constructions may be proposed. (See *People v. Anderson* (1972) 29 Cal.App.3d 551, 561 [105 Cal.Rptr. 664].) Standards under a regulation may be refined and developed on a case-by-case basis. (*Ford Dealers Assn. v. Department of Motor Vehicles, supra,* 32 Cal.3d at p. 367.) " '[T]his is neither unusual nor unconstitutional.' " (*Ibid.*)

Where, as here, we review the interpretation of a regulation by the board charged with enforcing the regulation, we must respect the subject matter expertise of the board. (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 645 [2 Cal.Rptr.2d 297].) The board's interpretation must be upheld unless it is clearly erroneous or unauthorized. (*Ibid.*)

Under these standards, we are compelled to reject Teichert's contention.

█ For starters, its proposed construction of the regulation is unreasonable. Under Teichert's interpretation, an employer would satisfy its obligation by simply giving operators general notice that there will be workers on foot at the jobsite. However, the regulation requires that operations be *controlled*. Control means " 'to exercise a directing, restraining, or governing influence over; to direct, to counteract, to regulate.' " (*Coffey v. Superior Court* (1905) 147 Cal. 525, 535 [82 P. 75]; see also *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 583 [94 Cal.Rptr.2d 3, 995 P.2d 139].) Control requires far more than the mere passive provision of general information.

In its reply brief, Teichert asserts the word "controlled" varies in interpretation and provides insufficient notice of prohibited conduct. We disagree. In the earth moving industry, circumstances will vary from jobsite to jobsite. It would not be feasible to draft detailed plans and specifications of all acts or conduct to be performed or prohibited, and it is not necessary to do so. A regulation can properly require an employer to maintain control over an operation, while leaving it to the employer to determine the most appropriate way to do so on a particular jobsite. (*Ford Dealers Assn. v. Department of Motor Vehicles, supra,* 32 Cal.3d at pp. 368–369.)

In contrast, the Board's interpretation of the regulation is reasonable. As the Board noted: "The hazard contemplated under the regulation is the

exposure of workers on foot to dangers of hauling or earth moving equipment. The safety order is designed to protect workers on foot and imposes an affirmative obligation upon an employer to control such operations. Hauling and earth moving operations inherently involve *movement* of equipment and vehicles in the defined area and the location of such vehicles changes within the area of operation. Only where control measures are used by the employer to ensure that operators know of workers on foot in their immediate vicinity will the safety order have the intended effect of protecting workers on foot from the hazards of hauling and earth moving equipment."

■ On its face, the regulation is intended to prevent the very type of accident that occurred here. McCorkle, a worker on foot, was injured by being struck by earth moving equipment because the operator was unaware of McCorkle's presence in the immediate vicinity of the operation. The Board's construction of the regulation to encompass such a situation is reasonable and must be upheld.

## II

Labor Code section 6401 states: "Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees."

Teichert argues that this statute imposes a standard of reasonableness and that the Board failed to evaluate Teichert's control over the operation under a standard of reasonableness.

Despite Teichert's assertion otherwise, this argument is actually a challenge to the sufficiency of the evidence. Thus, referring to Hoyt's conduct as "unpredictable, unforeseeable, unexpected, and careless" and "brief, momentary, unpredictable, unforeseeable," Teichert argues it should not be responsible for failing to control such conduct.

The evidence was sufficient to support the citation.

First, no one suggests that Hoyt would have driven her scraper into McCorkle if she had been aware of his presence. The regulation was adopted to require employers to ensure that operators are aware of the presence of workers on foot, precisely to prevent unexpected accidents. Calling Hoyt's conduct things such as "unpredictable" and "unexpected" does nothing to

rebut the fact that the accident occurred because Hoyt was not aware of McCorkle's presence in Hoyt's immediate vicinity.

Second, it is apparent that Teichert's employees had lost control over the operation. At the time of the accident, the east and west pads had received sufficient fill, and the fill area had been moved to a north pad. The haul road had been adjusted accordingly. McCorkle saw Hoyt follow the old haul road to the west pad, rather than take the new haul road to north pad. When Hoyt told McCorkle that she had struck a stake, he assumed this was the only reason why she had driven to the west pad. However, Hoyt believed that the west pad was still being filled. McCorkle did not clarify the matter. He simply told Hoyt to dump the load and return to the cut area.

If Hoyt had driven to the north pad to dump the load, her route back to the cut area would have taken her on the new haul road, and this accident would not have happened. However, after Hoyt dumped the load on the west pad, as she believed she was to do, her route back to the cut area took her across the east pad. After telling Hoyt to dump the load and return to the cut area, McCorkle did not watch her to ensure that she went to the north pad. In fact, he did not watch her at all. Although he knew to stay on the left side of a scraper where he would be visible to the operator, he began walking on the right side of Hoyt's scraper. His route took him directly onto the route Hoyt would take to return to the cut area after dumping the load on the west pad.

Third, there was conduct, or a lack thereof, prior to the accident that contributed to the accident. It was known that Hoyt was an apprentice. We do not suggest that an apprentice cannot be used, but this does demonstrate that Hoyt was known to have less experience than a journeyman. Thomas also knew that Hoyt had limited experience operating a scraper. When he asked her if she could operate a scraper, she said she thought she could but added either that she was not very good at it or had not done it in long time. Nonetheless, it appears that no one reviewed operating procedures or safety procedures with her. Thomas assigned her to a scraper, watched her for two loads, and then left her on her own.

Finally, Teichert presented no evidence that it had methods in place for controlling the operation. McCorkle testified that the haul road is considered a safe area for operators to drive. At the fill area, he directs the scrapers. Otherwise, it is the operator's responsibility to make sure that their path is safe, i.e., clear of people or objects the operators might hit. It thus appears that Teichert simply expects operators to stay on the haul road and has no procedures in place to protect workers on foot should the operator vary from that route.

To summarize, Teichert assigned Hoyt to drive a scraper, even though she lacked significant experience doing so. No one reviewed any operating and safety procedures with her. Immediately before the accident, Hoyt was confused as to the fill area and route for return to the cut area. McCorkle did not ensure that Hoyt knew what she was to do and the route on which to drive. McCorkle did not watch to ensure that Hoyt knew what she was to do. He then walked on the right side of the scraper, where he would not be visible to Hoyt. Together, this evidence supports the Board's findings that Teichert failed "to control its earth moving operations in such a manner as to ensure that its equipment operators knew of the presence of workers on foot in their area of operation" and that Teichert "could have known with the exercise of reasonable diligence" of the condition which violated the regulation.

## DISPOSITION

The judgment is affirmed.

Blease, J., and Nicholson, J., concurred.